1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DEBORAH M. SIMPSON,

                Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                Defendant.

Case No.  2:17-cv-00898-GMN-GWF

**REPORT AND RECOMMENDATION**

**Re:  Motion for Reversal and/or
Remand (ECF No. 18)**

       This case involves judicial review of an administrative action by the Commissioner of Social Security denying Plaintiff Deborah M. Simpson's claim for disability benefits under Title II of the Social Security Act.  Plaintiff filed her Motion for Reversal and/or Remand (ECF No. 18) on August 21, 2017.  The Commissioner filed her Cross-Motion to Affirm (ECF No. 19) and Opposition to Plaintiff's Motion to Remand (ECF No. 20) on September 20, 2017.

## BACKGROUND

### A.  Procedural History

       Plaintiff filed an application for a period of disability and disability insurance benefits on September 3, 2012 in which she alleged that her disability began on August 18, 2012. Administrative Record ("AR") 188.  The Social Security Administration denied Plaintiff's claim initially on October 22, 2013 (AR 113-116) and upon reconsideration on May 1, 2014.  AR 124-129.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was conducted on June 24, 2015.  AR 15.   Plaintiff and a vocational expert testified at the hearing. The ALJ issued his decision on September 9, 2015 and concluded that Plaintiff was not disabled at any time between the date her application was filed and the date of the decision.  AR 15-40. The Appeals Council denied her request for review on January 27, 2017.  AR 1-6.  Plaintiff then

1  commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been

2  referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. §

3  636(b)(1)(B) and (C).

4  **B. Factual Background**

5  Plaintiff's motion for reversal and/or remand is limited to whether the ALJ failed to

6  provide specific and legitimate reasons for rejecting the opinions of consultative examiner,

7  David Mumford, M.D., and treating physician, Ravi S. Ramanathan, M.D. with respect to

8  Plaintiff's physical residual functional capacity. The Court will therefore focus on the evidence

9  relating to Plaintiff's physical impairments and the extent to which they limited her residual

10  functional capacity to perform work. The records regarding Plaintiff's mental impairments are

11  discussed to the extent necessary to understand her alleged physical impairments.

12  **1. Plaintiff's Disability Reports and Hearing Testimony**

13  Plaintiff was born May 2, 1954. At the time of her application she was 5'3" tall and

14  weighed 152 pounds. AR 244. She resided with her husband, who is a disabled Vietnam

15  veteran. She earned her GED diploma and held several retail, human resources and customer

16  service-related jobs from 2004 through 2009. AR 50, 276. In her September 14, 2013 disability

17  report, Plaintiff listed her disabilities as lumbar disc degeneration, arthritis, and depression. AR

18  244. She stated that she stopped working on August 18, 2012 as a result of her conditions.

19  Plaintiff's husband stated that Plaintiff had problems walking, fell frequently, could not bend

20  down, or lift items over 10 pounds. She often had difficulty finding a comfortable sleeping

21  position. Her daily activities consisted of eating breakfast, doing light housekeeping, feeding the

22  cats, and watching television. AR 265-266.

23  Plaintiff stated in her July 13, 2013 function report that she was able to do light

24  housekeeping, washing, and prepare light meals. She took care of her cats, including feeding,

25  cleaning the kitty box, and grooming. AR 295. She went outside on a daily basis, drove a car,

26  and shopped for food and miscellaneous items. She was able to pay bills, count change, handle a

27  savings account and use a checkbook or money orders. AR 297. Plaintiff stated that her hobbies

28  were swimming and taking care of rescue horses, but that she was no longer able to do these

things. AR 298. Her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and use her hands. Her memory, ability to complete tasks, concentrate, and to get along with others was also affected. She could not lift more than 5 pounds, or walk more than 50 feet before needing to rest. She was also depressed. AR 299.

Plaintiff testified at the June 24, 2015 hearing that she spent most days sleeping in a dark room because of headaches, but could complete some housekeeping tasks and go to the grocery store. AR 51-52. Prescription medication was helpful, but made her feel tired and groggy. Her most recent job was in 2012 when she worked at the fine jewelry department at Macy's. She was only able to work in that job for a few weeks before back pain caused her to quit. Plaintiff was previously employed as a ticket manager for an online travel website for two years. She was laid off from that job in 2009. AR 53.

Plaintiff testified that she filed for disability because she began to feel increasing pain in her lower back which prevented her from performing work that required bending, stretching, or standing for extended periods of time. AR 54-55. Her doctor prescribed physical therapy for her back pain, but she received no relief. Her doctor allegedly told her that surgery would not help her condition. AR 55-56.

Plaintiff also testified that she experienced migraine headaches for most of her life and continued to experience them daily. Medication helped relieve the headaches, but made her drowsy, which in turn made it harder to work. A recent MRI of her cervical spine revealed cysts on her thyroid. She had not yet started treatment for this because she was being tested for possible cervical cancer. AR 57. She had carpal tunnel syndrome which caused her hands to cramp and lock-up. It was impossible to grab or hold anything because her hands felt numb. She was prescribed cortisone medication, but stopped taking it because it caused significant hair loss. AR 58-59. Plaintiff had difficulty walking long distances and could only walk comfortably for about 200 feet before she experienced pain and began to limp. She could only stand for approximately fifteen minutes. She had fallen because of leg pain and numbness. AR 60. She could sit at one time for approximately 30 minutes. She spent most of her time asleep in bed. Plaintiff testified that she was bipolar, which caused her to feel very fatigued. She had

difficulties concentrating and making decisions, and felt depressed most of the time.  AR 61-62.

Finally, she testified that she had more recently developed a cyst on her right knee, which had

been treated with cortisone shots.  The right knee was very painful and limited her mobility.  AR

62-63.

### 2. Vocational Expert's Testimony

The vocational expert testified that Plaintiff's past work as a travel guide was light work

with an SVP of 6 as defined in the Dictionary of Occupational Titles ("DOT").  Her work as a

jewelry salesperson was also light work with an SVP of 5.  AR 64-65.

The ALJ asked the vocational expert to assume a hypothetical individual of advanced

age, close to retirement, with the same work experience and educational level as Plaintiff.  The

hypothetical individual was limited to light work as defined by the DOT, with occasional

climbing of stairs and ramps, no climbing of ladders, ropes or scaffolds, frequent balancing,

occasional stooping, occasional kneeling, occasional crouching, occasional crawling, no

exposure to hazards such as heights or dangerous moving machinery, and occasional exposure to

vibrations.  The vocational expert testified that a hypothetical person with these limitations

would be able to do all of Plaintiff's past work.  AR 65.

The ALJ asked whether the hypothetical individual would be able to perform Plaintiff's

past work if standing and walking was limited to a total of four hours in an eight-hour workday.

The vocational expert testified that the individual would still be able to perform the position of

travel clerk.  The travel clerk position would also still be available if the individual was limited

to sedentary work.  The vocational expert testified that it would be difficult to perform Plaintiff's

past work if a sit-stand option was required.  He also testified that there were no transferable

skills to other work if a sit-stand option was required. AR 65-66.

Plaintiff's counsel asked whether the hypothetical individual could perform any work if

she could only remain seated for a total of three hours, stand and walk for a total of one hour, and

occasionally lift five pounds.  The vocational expert testified that a person with those limitations

would not be employable.  The individual would also not be employable if she was off task one-

third of the time in an eight-hour workday or absent from work three or more times per month. AR 66-68.

### 3. Medical Records

Plaintiff was seen by Dr. Ravi Ramanathan on July 9, 2012 for "follow-up on her chronic pain." She reported that she went to an urgent care facility the previous week for severe pain in her right lower back that traveled to the abdominal area and down the leg. Dr. Ramanathan also stated: "When to country and with hiking, her legs gave out on her and fell twice, bruises due to this." An x-ray taken at the urgent care facility reportedly showed moderate degenerative arthritis. AR 389. Dr. Ramanathan's assessment was backache NOS, abdominal pain unspecified site, muscle weakness-general, fall NEC, and lumbosacral spondylosis. He prescribed Flexeril and Prednisone, and stated that an MRI would be obtained if she did not get better. AR 390.

Dr. Ramanathan saw Plaintiff in follow-up on July 26, 2012. She reported severe right low back pain. She felt better while on Prednisone, but the pain returned after she was through taking it. She had recently gone back to work, but after standing for about four hours, she felt like she had shin splints. She was concerned whether she would be able to stand for a whole eight hour shift. The bruising on her right buttocks and right leg had resolved. She stated that she wanted to go back to the gym for strength training. Dr. Ramanathan referred Plaintiff for a lumbar MRI and continued her on her previous medications. AR 392-393. On August 21, 2012, Plaintiff reported that she was still in pain. The Prednisone helped while she was taking it. The doctor reviewed the MRI results, and indicated that he would not make a referral to pain management "until we have tried conservative approach with meds at this time." AR 395-396.

An MRI of the lumbar spine on August 16, 2012 showed that the L2-3 disc was mildly desiccated with slight retrolisthesis of L2 upon L3. There was a 3.1 mm posterior bulge. The L3-4 disc demonstrated a 3.9 mm posterior bulge. The L4-5 disc was markedly narrowed with a 6.2 mm posterior protrusion with annular tear. The thecal sac measured 6.9 mm. There was moderate spinal canal stenosis. The L5-S1 disc was desiccated and demonstrated a 4.3 mm

posterior bulge.  There was moderate bilateral L3-4, L4-5, and L5-S1 foraminal narrowing.  AR 409-410.

Plaintiff was seen by Dr. Alexander Imas at Dynamic Pain Rehabilitation on September 6, 2012.  She reported having low back pain for two months.  Her right leg gave out, and she had fallen several times in the last few months.  She had pain radiation to the right leg.  Plaintiff stated that her pain possibly began as a result of moving furniture for new flooring.  She rated the pain as 9/10 at its worst, and 8/10 at its best.  It was aggravated by standing and walking.  She could sit for 30 minutes before having to get up and move about, and she could stand for 30 minutes before having to sit down.  On physical examination, there was a positive Patrick's test on the right for the hip and sacroiliac joints.  Both hips had normal range of motion, and there were no physical abnormalities.  Straight leg raising test was normal to 90 degrees on the right.  Plaintiff had sciatic pain on deep gluteal palpation.  Radicular symptoms were non-reproduceable.  Dr. Imas gave Plaintiff prescriptions for Naproxen, and Ultram and advised her to follow-up in one month.  AR 367-370.

Plaintiff saw Dr. Ramanathan on September 25, 2012 and stated that she needed a referral to physical therapy because she was not "getting any better with pinched nerve."  She had right leg swelling.  She could not sit for very long, tried to elevate her legs in the morning, and was barely functioning on a daily basis.  Plaintiff stated that her life was at a standstill.  "'I cannot even ride my horses.'"  AR 435.  She felt that she was stuck doing minimal items which was causing her mood to go down.  Dr. Ramanathan's assessment was pain in the soft tissue of the limb, unspecified backache, sciatica, and generalized muscle weakness.  AR 435.  He gave her a referral to "Max Health Centers" for leg pain/numbness and to a chiropractor.  He also prescribed Lortab.  AR 436.  Dr. Ramanathan saw Plaintiff again on October 16, 2012 with essentially the same complaints and diagnoses.  He gave her a referral for physical therapy.  AR 437-438.

Plaintiff was evaluated by Mattsmith Physical Therapy on October 19, 2012.  She reported a three month history of low back pain and right leg pain/numbness/tingling.  Her current pain level was 9/10 in the lumbosacral area, greater on the right than left.  She could

stand comfortably for 10 minutes, sit comfortably for 15 minutes, and had limited ability to bend forward at the waist. She reported that the mechanism of her injury was a gradual onset. On objective examination of the thoracolumbar planes, Plaintiff had 4/5 extension on the right and left, and 4/5 flexion on the right and left. She had posterior tenderness. Range of motion of the lumbosacral spine was 100 percent for extension and 50 percent for flexion   AR 416-417. Plaintiff received weekly physical therapy treatments from October 19, 2012 through December 5, 2012. AR 415-432. Her pain level remained at 9/10 until November 26, 2012 when she reported that it was 5/10. AR 427. Plaintiff also followed a home exercise program.

On November 20, 2012, Plaintiff reported to Dr. Ramanathan that physical therapy had helped a little, but that overall her condition was worsening. She complained of chronic pain. She also requested that her physical therapy include her shoulders due to numbness in her hands. She stated that her hands were intermittently numb all day long, and worse at night. On examination, Dr. Ramanathan noted that the spinal curve appeared normal and she could stand unassisted. Palpation was positive for vertebral tenderness, paraspinous muscle tenderness on the right and left, and negative for sacroiliac joint tenderness. Plaintiff had no limp. Her range of motion was normal with pain, and straight leg raising was normal. Dr. Ramanathan's diagnosis included carpal tunnel syndrome, chronic pain, and muscle spasms. He instructed Plaintiff wear a wrist brace for two weeks and indicated that if that didn't assist with the pain, he would refer her to a hand surgeon. AR 440-441.

Plaintiff next saw Dr. Ramanathan on January 8, 2013. Her chronic pain was stable with medications. She reported that physical therapy temporarily relieved her pain. Epidural injections were no help. She was working out at the gym to strengthen her muscles and help with the pain. Walking helped, but she could not walk far without pain. AR 443. Dr. Ramanathan's assessment remained unchanged. He referred Plaintiff to Dr. Satish Sharma, a pain management specialist, and told Plaintiff that his facility did not manage patient's chronic pain symptoms with narcotics. AR 444.

Plaintiff saw Dr. Ramanathan on several occasions between February 2013 and August 25, 2014. AR 446, 467-475, 605-613. During these visits, Plaintiff complained of low back and

neck pain.  She also complained of migraine headaches, throat pain, locking-up and numbness in her fingers, and numbness sensations in her hands and legs.  Dr. Ramanathan generally observed that Plaintiff did not appear to be in acute distress, that she was cooperative, alert and oriented, and appeared well-nourished.

On February 7, 2013, Plaintiff complained of bilateral hand numbness, migraines and hair loss.  Dr. Ramanathan diagnosed carpal tunnel syndrome and ordered an ultrasound in her lower right extremity.  AR 490-491.  Plaintiff also saw Dr. Ramanathan on May 2, 2013 who noted her complaints related to carpal tunnel syndrome, as well as ongoing back complaints.  AR 472.  On September 25, 2013, Plaintiff was seen by a physician's assistant in Dr. Ramanathan's clinic who noted her "trigger finger" symptoms on all fingers and thumbs, and complaints of numbness in both hands at night.  Plaintiff also complained of a rash which was very itchy.  She had been "outside a lot to see her horses daily" and had been around a lot of bugs, especially red ants.  AR 469.  Plaintiff was supposed to be seen by an orthopedic physician in the clinic, but her appointments kept getting canceled.  AR 469.  Plaintiff was given a referral to see Dr. Sorelle, a hand surgeon.  AR 470.

Plaintiff was seen by Dr. Jonathan Sorelle on November 21, 2013 for her carpal tunnel symptoms.  Dr. Sorrell noted that Plaintiff had significant pain over the distal palm on the bilateral hand, thumbs, and finger.  The pain had been present for approximately three months.  She had general stiffness in the fingers especially in the morning upon waking.  Her right digit was intermittently locked.  Plaintiff had near complete numbness in both hands, but had not received an EMG study.  AR 542.  Dr. Sorrell stated that given the duration of Plaintiff's symptoms and his physical examination, a bilateral upper extremity EMG should be obtained to evaluate for evidence of a surgically correctable neuropathy.  He stated, however, that regardless of where the nerve compression was, surgery would be indicated unless her symptoms were relieved by non-operative measures.  AR 543.  On December 19, 2013, Dr. Ramanathan noted that Plaintiff had seen Dr. Sorelle who recommended carpal tunnel surgery.  Plaintiff also reported that she had seen Dr. Leon who recommended low back surgery.  AR 553.

Dr. David Mumford performed a consultative examination of Plaintiff on May 8, 2013 at the request of the Bureau of Disability Adjudication.  AR 454-459.  He reviewed a September 6, 2012 medical record which stated that Plaintiff had low back pain radiating into the right lower extremity.  She had a positive MRI of the lumbosacral spine which showed narrowing at L5-S1.  Straight leg raising testing at that time was normal, and there was a diagnosis of right sciatica and right sacroiliitis.  AR 457.

Plaintiff told Dr. Mumford that she had constant pain in the low back related to an injury.  The pain was made worse by standing, sitting, and walking, and was improved by lying down.  She also reported pain in various joints, including the hands, hips, knees, and feet.  She stated that she had been diagnosed with rheumatoid arthritis.[1]  Plaintiff also reported constant pain with swelling and stiffness of the legs.  AR 454.  Dr. Mumford described Plaintiff as credible, cooperative, and friendly throughout the examination.  Her movements were normal and she did not require an assistive device to ambulate.  She was able to bend fully at the waist to remove her riding boots, and she tugged at the boots with both hands.  She was able to sit comfortably in a chair without shifting, and could stand up from a sitting position, and sit up from a supine position without difficulty.  She was able to get on and off the examination table without the assistance of a footstool.  AR 455.

Examination of the shoulders and hands was normal.  Patrick's test on the lower right extremity was normal.  There was no deformity or swelling of the joints.  Range of motion for the upper and lower extremities was normal.  There was no evidence of significant kyphosis, lordosis, or noticeable scoliosis in the spine.  No pain was elicited on palpation of the paravertebral area.  Range of motion of the lumbar spine while standing showed flexion from 0 to 80 degrees, and right and left lateral flexion from 0 to 25 degrees.  Sitting and supine straight leg raising tests were normal.  Plaintiff was able to transfer easily from a sitting to a lying position.  She was able to sit up from a lying position with her legs extended and touch her ankles.  She was able to perform 40 percent of a full squat.  AR 456.  The neurological

---

[1] Dr. Mumford examined Plaintiff prior to Dr. Sorelle's diagnosis of carpal tunnel syndrome in November 2013.  Dr. Mumford did not discuss the possibility of carpal tunnel syndrome.

1   examination findings were also normal.  Plaintiff had normal motor strength and reflexes, good

2   coordination, and her gait and station were within normal limits.  Light touch in the upper and

3   lower extremities was normal.  AR 457.

4       Dr. Mumford noted that Plaintiff had subjective complaints of pain associated with

5   numbness of the legs.  There was no clinical evidence of radiculopathy.  He stated: "She has an

6   MRI which was done in August 2012 showing some moderate spinal canal stenosis at L4-5 and

7   dextroscoliosis.  The diagnosis is chronic low back pain secondary to degenerative disc disease

8   of the lumbosacral spine associated with some dextroscoliosis."  There was no evidence of any

9   significant or acute arthritis in the joints, and specifically no evidence of rheumatoid arthritis.

10  AR 457.

11      Dr. Mumford stated that Plaintiff could occasionally lift 20 pounds and frequently lift 10

12  pounds.  She could stand and/or walk for six hours in an eight hour workday.  She did not need

13  an assistive device for ambulation.  Plaintiff was able to sit four hours in an eight hour workday,

14  and she would need to alternate standing and sitting.  She could occasionally climb ramps and

15  stairs, but never climb ladders and scaffolds.  She had no restrictions on balancing.  She could

16  occasionally stoop, bend, kneel, crouch, squat, and crawl.  She had no limitations in regard to

17  reaching, fingering, or handling objects; or in hearing, seeing, speaking, or traveling.  Plaintiff

18  did not have environmental limitations.  AR 458-459.

19      Dr. L.D. Larson conducted a consultative psychological evaluation on September 18,

20  2013 at the request of the Bureau of Disability Adjudication.  Dr. Larson observed no problems

21  in the Plaintiff's ambulation, balance or posture.  She was adequately dressed and appeared

22  sufficiently groomed.  No involuntary movements or tremors were observed.  Plaintiff stated that

23  she could not sit or stand for very long, and that she had chronic pain from neck and back

24  injuries.  AR 460.  Plaintiff stated that she had had horrible pain over her entire body for two to

25  four years.  The pain occurred all the time, so she took medication all the time.  She reduced the

26  pain with heat treatments, electrical stimulation, exercises, and lying down.  Plaintiff stated that

27  she was unable to work, was not applying for work, and did not plan to return to work.  AR 461.

28

1    Plaintiff reported the following activities of daily living:  She got up each morning

2    between 8:00 AM and 12 PM.  She spent her morning caring for her cats, showering, snacking,

3    taking her medications, and lying back down for relief.  She slept most of the day to relieve the

4    pain throughout her body.  Her usual evening activities included eating something and going

5    back to bed between 7:00 and 8:00 PM.  She did not sleep well.  Plaintiff stated that with the

6    help of others, she could wash dishes, clean house, vacuum, do laundry, and take care of her

7    pets.  She was able to drive her own car, and could go grocery shopping, but needed help.  She

8    could make her own shopping list, pay the right amount of money and count change.  She did not

9    have a checkbook.  She could bathe in a shower or tub.  She was able to dress herself, take care

10    of her hair, and take care of her clothing.  Plaintiff stated that she could not concentrate on a task

11    until it was finished and she could not understand or remember what she read or watched on

12    television.  AR 462.

13    Dr. Larson opined that Plaintiff had a low average to average range of intellectual ability.

14    She had sufficient general cognitive ability to carry out an extensive variety of complex

15    instructions, detailed instructions, and simple one and or two-step instructions.   She was able to

16    interact appropriately with supervisors, co-workers or the public, although her physical

17    symptoms might diminish her desire to socialize.  Her concentration, persistence and pace was

18    adequate.  She appeared capable of handling her personal finances.  AR 464.

19    State agency physician Dr. Richard Long performed a records review and provided an

20    assessment of Plaintiff's residual functional capacity on June 25, 2013.  Dr. Long found that

21    Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds.  She could stand and/or

22    walk for four hours in an eight hour workday, and sit, with normal breaks, for about six hours in

23    an eight hour workday.  She was limited to occasional climbing of ramps and stairs, but could

24    never climb ladders, ropes or scaffolds.  She could balance frequently, and stoop, kneel, crouch,

25    and crawl occasionally.  He based these limitations on Plaintiff's severe lumbar degenerative

26    disc disease, stenosis, and foraminal stenosis.  Plaintiff had no manipulative, visual, or

27    communicative limitations.  Environmentally, she needed to avoid hazards such as machinery

28    and heights.  AR 86-88.  Dr. Long noted that Plaintiff's physical complaints became significant

after moving furniture in the early summer of 2012.  Dr. Long concluded that "[i]t would seem more reasonable than not that claimant would not be able to sustain any activity greater than sedentary."  AR 88.  State agency physician Dr. Yondell Moore provided a residual functional capacity assessment on April 22, 2014.  Her findings were the same as those of Dr. Long.  AR 106-109.

On February 16, 2014, Dr. Ramanathan completed an impairment questionnaire.  He stated that Plaintiff had lumbar disc disorder with myelopathy, unspecified nerve disorder with radiculitis, carpal tunnel syndrome, and cervical disc disorder with myelopathy.  The diagnoses were based on positive cervical and lumbar MRI's and the hand surgeon's (Dr. Sorelle's) consultation.  AR 570.  Plaintiff's primary issues were back pain, carpal tunnel and neck pain.  She had stabbing pain down the legs, with radiation down to the feet.  Her pain without medication was 9/10, and was 7-8/10 with medication.  She also had carpal tunnel hand weakness.  Her pain was aggravated by walking or sitting more than 5-10 minutes.  Her most comfortable position was lying down.  Dr. Ramanathan listed the medication that had been prescribed to Plaintiff, as well as physical therapy and epidural injections which had not worked.  AR 571.  He stated that Plaintiff could perform a job in a seated position for 2-3 hours total in an eight hour workday.  She needed to avoid continuous sitting, and needed to get up and move around every fifteen to thirty minutes.  She could not lift or carry more than five pounds occasionally.  She could never grasp, turn or twist objects, could occasionally use her hands and fingers for fine manipulations, but could never use her arms for reaching.  He noted that reaching caused pain to radiate to her low back and legs.  Plaintiff's pain and numbness would likely increase if she was placed in a competitive work setting.  She would frequently experience pain and numbness that would interfere with her attention and concentration.  She would need to take unscheduled breaks at work.  She would be absent from work more than three times a month.  Dr. Ramanathan did not provide a specific date upon which Plaintiff's limitations became disabling.  He noted that she began complaining of bilateral shoulder discomfort on February 12, 2009.  AR 572-574.

Dr. Ramanathan also provide a narrative report of his evaluation of Plaintiff's disability. He stated: "It is my conclusion to a reasonable degree of medical certainty that Ms. Simpson is disabled and will be so for greater than 12 months if not longer. She will need surgery for pain, further treatment with therapy and long term use of medications such as Lortab. Lortab is a narcotic which will impair her ability to concentrate and focus." AR 577.

Following his February 16, 2014 disability reports, Dr. Ramanathan treated Plaintiff for a right knee cyst. AR 608-611. On August 25, 2014, he noted that Plaintiff complained of worsening back pain, that it was difficult to lift heavy objects, which caused grocery shopping to be frustrating. Light housework also caused pain to go down her legs. AR 606.

**C. Administrative Law Judge's Decision**

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration, 20 CFR § 416.920(a), in determining whether Plaintiff was disabled. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act on December 31, 2014 (which presumably means her last date insured). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 18, 2012. At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, degenerative changes of the lumbosacral spine, and degenerative joint disease of the cervical/lumbosacral spine. Plaintiff's diagnoses also included bilateral carpal tunnel syndrome (CTS), migraines, right knee cyst, goiter, thyroid cysts, and "abnormal pap smears." The ALJ found that these impairments were not severe. In particular, the ALJ noted that there was no EMG study to support Plaintiff's alleged limitation from carpal tunnel syndrome. AR 17. The ALJ also found that Plaintiff's allegations of multiple arthralgias and rheumatoid arthritis were not medically determinable impairments because there were no labs, rheumatologist findings or other objective findings to support these diagnoses. AR 17-18. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR § 416.1567(b). She could lift and carry no more than 10 pounds frequently, and no more than 20 pounds occasionally. She could sit for six hours, cumulatively, and stand and/or walk for four hours, cumulatively, in an eight-hour workday. She could frequently balance. She could not climb ladders, ropes or scaffolds, but could occasionally climb stairs and ramps, and stoop, bend, crouch, crawl and kneel. She could occasionally tolerate exposure to vibration, but was precluded from working around hazards such as heights and dangerous moving machinery. AR 21.

In making this assessment, the ALJ stated that after considering the all symptoms and the extent to which they could be accepted as consistent with the objective medical evidence, he found that "the claimant's medically determinable impairments may not reasonably be expected to produce the alleged symptoms, to the extreme degree alleged. Consequently, her statements concerning, the intensity, persistence and limiting effects of these symptoms are not substantially credible in consideration of the record in its entirety." AR 21.

The ALJ noted that Plaintiff's testimony--that she sleeps most of the time in a dark room due to all over body pain and daily migraines--was contrary to her reports to primary care providers that medications worked "great" in managing her headaches. He also noted the absence of adverse brain scans to support a diagnosis of migraines. Plaintiff was able to grocery shop, drive an automobile and do a little cleaning. The ALJ repeatedly stated that Plaintiff reportedly spent a great deal of time outside with her two horses; that she reportedly takes care of her disabled husband who has dementia; and that she spent a great deal of time working-out at her gym. AR 20-22. The ALJ stated that "there [was] no convincing evidence of limitation in daily activities." AR 20 The ALJ noted that Plaintiff experienced a back flareup after she engaged in moving furniture. AR 22. He also found that Plaintiff's husband's third party report was not credible because it was inconsistent with Plaintiff's activities of daily living, which were virtually unfettered. AR 23.

The ALJ extensively summarized and evaluated the medical records which showed that physical examination findings were generally normal. He also noted the absence of an EMG to

document carpal tunnel syndrome, and that there was no evidence that Plaintiff had, in fact, consulted with an orthopedic surgeon regarding back surgery. AR 23-29.

The ALJ gave minimal weight to Dr. Ramanathan's opinion that Plaintiff was disabled because it was inconsistent with the objective findings in the medical records, there were no hospitalizations during the relevant period, and Plaintiff reported "virtually unfettered" daily activities. AR 32. The ALJ gave mixed weight to Dr. Mumford's opinion regarding Plaintiff's residual functional capacity. Overall, he agreed with Dr. Mumford's assessment, except for his opinion that Plaintiff would need a sit-stand option to perform work. The ALJ found that there were no objective examination findings that Plaintiff needed such a limitation. AR 34. The ALJ accorded significant weight to the opinions of Dr. Long and Dr. Moore, but disagreed with their assessment that Plaintiff should be limited to sedentary work. AR 36-37. Based on his determination of Plaintiff's residual functional capacity, the ALJ found that Plaintiff was capable of performing her past work as a travel clerk. AR 39. He therefore concluded that she was not disabled at any time from August 18, 2012. AR 40.

## DISCUSSION

### I.    Standard of Review

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is

required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II. Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work,

1    the burden shifts to the Commissioner to show that the claimant can perform a significant

2    number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074–

3    75 (9th Cir. 2007). Social Security disability claims are evaluated under a five-step sequential

4    evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162

5    (9th Cir. 2001). If a claimant is found to be disabled, or not disabled, at any point during the

6    process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). The ALJ correctly set

7    forth five steps in his decision, AR 16-17, and they will not be repeated here.

8    **III. Whether the ALJ Failed to Provide Specific and Legitimate Reasons for Rejecting the Opinions of Dr. Mumford and Dr. Ramanathan.**

9    Under the standards in effect when Plaintiff's claim was adjudicated, more weight should

10   generally be given to the opinion of a treating physician than to those of physicians who do not

11   treat the claimant. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Lester v. Chater*, 81

12   F.3d 821, 830 (9th Cir. 1995). The opinion of an examining physician is also generally entitled

13   to greater weight than that of a reviewing physician. *Id.*, at 1012 (citing *Ryan v. Comm'r of Soc.*

14   *Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). The weight afforded to a reviewing physician's

15   opinion depends on the degree to which he provides a supporting explanation for his opinions.

16   *Id.* If a treating or examining physician's opinion is contradicted by another doctor's opinion,

17   the ALJ may only reject it by providing specific and legitimate reasons supported by substantial

18   evidence. "This is so because, even when contradicted, a treating or examining physician's

19   opinion is still owed deference and will often be 'entitled to the greatest weight ... even if it does

20   not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orne v. Astrue*,

21   495 F.3d 625, 633 (9th Cir. 2007)).

22   The ALJ is not bound by a treating physician's opinion that a claimant is disabled.

23   *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). While a treating physician's evaluation of

24   a patient's ability to work may be useful in the disability determination, a treating physician

25   ordinarily does not consult a vocational consultant or have the expertise of one. "An impairment

26   is a purely medical condition. A disability is an administrative determination of how an

27   impairment in relation to education, age, technological, economic, and social factors, affects the

28

1   ability to engage in gainful activity."  The law reserves the disability determination to the

2   Commissioner.  *Id.* at 884 (citing 20 C.F.R. § 404.1527(e)(1)).

3          The ALJ rejected Dr. Mumford's and Dr. Ramanathan's opinions, in large part, because

4   Plaintiff's statements and testimony regarding the severity of her pain and physical limitations

5   were not credible in view of her activities of daily living, and in view of the objective medical

6   evidence which generally showed that she had near full ranges of motion, muscle strength and

7   lack of neurological findings.

8          In evaluating the credibility of a claimant's testimony regarding the severity of pain and

9   other symptoms, the ALJ must first determine whether the claimant has presented objective

10  medical evidence of an underlying impairment which could reasonably be expected to produce

11  the pain or other symptoms alleged.  *Garrison v. Colvin*, 759 F.3d at 1014, *Lingenfelter v.*

12  *Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  If the claimant satisfies the first step, and there

13  is no evidence of malingering, then the ALJ can only reject her testimony by offering specific,

14  clear, and convincing reasons for doing so.  *Id.* at 1014–15 (citing *Smolen v. Chater*, 80 F.3d

15  1273, 1281 (9th Cir. 1996) and *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)).

16  An ALJ may not discredit a claimant's testimony solely on the grounds that the objective

17  medical evidence does not support her testimony.  To find the claimant not credible, the ALJ

18  must rely either on reasons unrelated to the subjective pain testimony, e.g., reputation for

19  dishonesty, on conflicts between her testimony and her own conduct, or on internal

20  contradictions in that testimony.  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 884 (9th Cir.

21  2006).  Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *5, states that "objective

22  medical evidence is a useful indicator to help make reasonable conclusions about the intensity

23  and persistence of symptoms, including the effects those symptoms may have on the ability to

24  perform work-related activities[.]"  The ALJ must consider whether an individual's statements

25  about the intensity, persistence, and limiting effects of her symptoms are consistent with the

26  medical signs and laboratory findings.

27          In *Garrison v. Colvin*, 759 F.3d at 1016, the court stated that ALJs must be especially

28  cautious in concluding that daily activities are inconsistent with testimony about pain, because

1   impairments that would unquestionably preclude work and all the pressures of a workplace

2   environment will often be consistent with doing more than merely resting in bed all day.

3   Disability claimants should not be penalized for attempting to lead normal lives in the face of

4   their limitations.  Only if the level of activity is inconsistent with the claimed limitations, will

5   these activities have any bearing on credibility. The court noted the critical differences between

6   activities of daily living and activities in a full-time job.  The court stated that the ALJ in that

7   case committed two errors:  First, the ALJ mischaracterized the claimant's testimony by ignoring

8   the limitations that she placed on her ability to perform certain activities.  Second, the ALJ erred

9   in finding that the claimant's activities, if performed in the manner she described, were

10  inconsistent with her testimony regarding her pain related impairments.

11          The ALJ in this case repeatedly emphasized that Plaintiff spent a great deal of time

12  outside with her horses, took care of her disabled husband, and engaged in a great deal of time

13  working out at her gym, all of which was inconsistent with the pain, fatigue and other limitations

14  she claimed.  The record, however, does not substantially support this description of Plaintiff's

15  activities after August 18, 2012 which was her alleged onset date of disability.  It is reasonably

16  clear from the records that Plaintiff reported the onset of significant low back pain and radiating

17  symptoms that began in or about July 2012.  The precipitating cause(s) of these symptoms,

18  however, are not clear from the medical records or Plaintiff's testimony.  She reported to Dr.

19  Ramanathan on July 9, 2012 that she had gone to an urgent care facility the previous week for

20  severe low back pain and she appeared to provide of history of having fallen while hiking.[2]  AR

21  389.  She told Dr. Imas on September 6, 2012 that she had had low back pain for the past two

22  months, i.e., consistent with an onset in or about July 2012.  She also reported that her leg gave

23  out and she had fallen several times.  She also stated that her back pain possibly began as a result

24  of moving furniture.  AR 367.  She told the physical therapist on October 19, 2012 that she had a

25  three month history of low back pain, and right leg pain, numbness and tingling.  She reportedly

26  stated that "mechanism of injury" was "gradual onset: Insidious."  AR 416.  During in June 24,

27

28  [2] Prior medical records in September 2011 and March 2012 did not reference complaints of low back pain or radiating symptoms into the legs.  AR 375-376, 379-380, 383-384.

19

2015 hearing, Plaintiff appeared relate the onset of her low back pain to the physical requirements of her job as a jewelry salesperson at Macy's in August 2012.  AR 54-55.

Despite the reported onset of significant low back pain and radiating symptoms in July 2012, the ALJ cited medical records from October 2009, July 2010, September 2011 which indicated that she "worked out" a great deal as support for his conclusion that Plaintiff's activities of daily living were inconsistent with her complaints of severe back pain and radiating symptoms.  AR 23-24.  The Commissioner cited these same records in support of the argument that the ALJ properly considered Plaintiff exercise activities in assessing her credibility.  *Cross-Motion to Affirm* (ECF 19), at 8.  Plaintiff did report on January 8, 2013 that she was "working out at a gym to strengthen m. to help with pain.  Walking is helping patient.  But challenges walking.  Cannot walk far without pain."  AR 443.  This record does not suggest that Plaintiff was engaging in a regular or frequent program of physical exercise inconsistent with her reports of significant back pain and limitations.

Plaintiff stated in her October 2012 function report that horseback riding, swimming, exercise, and work were activities she previously did, but could not do now.  AR 285.  She told Dr. Ramanathan on September 25, 2012 that she could not sit for very long, tried to elevate her legs in the morning and was barely functional on a daily basis.  She stated that her life was at a standstill, and reportedly stated:  "I cannot even ride my horses."  AR 435.  A year later, on September 25, 2013, Plaintiff reported that she was "outside a lot to see her horses daily."  AR 469.  This noted did not state that Plaintiff was horseback riding or engaging in other physical activity such as feeding or grooming her horses.  The statement, however, was arguably inconsistent with her testimony that she spent most of her time indoors.  It is perhaps also noteworthy that at the time of her examination by Dr. Mumford on May 8, 2013, Plaintiff was wearing riding boots.  AR 455.  Otherwise, the medical records do not indicate Plaintiff was engaged in horseback riding or related physical activities that contradicted her statements that she experienced severe back pain and radiating leg symptoms.  Plaintiff and her husband resided in a condominium.  AR 52.  The record is silent as to where her horses were located and who took care of them.  The ALJ did not inquire about these matters during the hearing.  In his

decision, however, the ALJ exaggerated the evidence regarding Plaintiff's involvement with her horses and physical exercise to discredit her testimony.

Although Plaintiff stated that she cared for her disabled husband who has dementia, she did not describe any specific activities she performed for him, other than some routine household chores and cooking. Plaintiff's husband stated in his third-party function report that Plaintiff had problems walking, frequently fell, could not bend down, or lift items over 10 pounds. Plaintiff stated that she was able to do light housekeeping, washing and prepare light meals. She also took care of her cats, went outside daily, drove a car and shopped for food and miscellaneous items. The record indicates that Plaintiff was capable of performing significant activities of daily living with some limitations. It does not demonstrate, as the ALJ asserted, a "virtually unfettered" ability to engage in activities of daily living inconsistent with Plaintiff's testimony about her disabling conditions. *See Garrison, supra.* The ALJ did not provide clear, and convincing reasons for rejecting the credibility of Plaintiff's testimony based on of her activities of daily living.

The other basis for the ALJ's credibility determination was the lack of objective clinical findings to support Plaintiff's statements that she was experiencing severe pain and physical limitations. Plaintiff, however, had a lumbar spine condition that reasonably could cause her low back pain and radiating leg symptoms. Although Dr. Mumford found that Plaintiff had the physical capacity to perform most of the activities required for sedentary or light work, he found that she would require a sit-down option due to her complaints of low back pain and radiating symptoms. Absent a legitimate basis for discrediting Plaintiff's testimony regarding the severity of her symptoms, the ALJ did not provide specific and legitimate reasons to reject Dr. Mumford's opinion that a sit-stand option was necessary.

Based on all of the evidence of record, including Dr. Mumford's opinion and the opinions of the state agency physicians, the ALJ did not err in rejecting Dr. Ramanathan's opinion that Plaintiff had a much more restrictive residual functional capacity. The objective clinical evidence raises serious doubt that Plaintiff was as limited by pain as she alleged. She generally had full range of motion, normal reflexes, and lack of neurological findings on

examination to support her claims of radiating symptoms.  The ALJ also correctly questioned the severity of Plaintiff's alleged carpal tunnel syndrome in view of the lack of an EMG study, or any evidence that Plaintiff obtained medical treatment for her carpal tunnel symptoms, other than wearing a brace.  There is no evidence that Plaintiff was unable to obtain necessary medical treatment because of lack of insurance or financial resources.

**IV. Whether this case should be remanded for an award of benefits or for further administrative proceedings.**

The Ninth Circuit has established a three-part credit-as-true standard which must be satisfied in order to remand a case to the Social Security Administration with instructions to calculate and award benefits.  The test requires the court to find that (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence was credited as true, the ALJ would be required to find the claimant disabled on remand.  *Garrison v. Colvin*, 759 F.3d at 1020 (citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)).  *Garrison* states that it may be an abuse of discretion not to remand with direction to make payment when all three conditions are met.  The court stated, however, that the rule envisions some flexibility and the case should be remanded for further proceedings if an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.  *Id.* at 1020–21.  In *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101–02 (9th Cir. 2014), the court stated that even when the elements of the credit-as-true rule are present, the decision to remand for additional evidence or simply to award benefits is in the discretion of the court.

Remand for further hearing and determination of disability is proper in this case because the ALJ did not provide clear and convincing reasons for rejecting the credibility of Plaintiff's testimony regarding the severity of her symptoms, which, in turn, undermined the ALJ's

rejection of Dr. Mumford's opinion that Plaintiff requires a sit-stand option.  The record as a whole creates serious doubt, however, as to whether Plaintiff was, in fact disabled.  This case should therefore be remanded for further hearing and a determination of whether Plaintiff was disabled.  Accordingly,

**RECOMMENDATION**

       **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and/or Remand (ECF No. 18) be **granted** and that the Commissioner's Cross-Motion to Affirm (ECF No. 19) be **denied.**

       **IT IS FURTHER RECOMMENDED** that this matter be remanded to the agency for further hearing and a determination of whether Plaintiff was disabled within the meaning of the Social Security Act at any time between August 18, 2012 and, December 31, 2014.

**NOTICE**

       Pursuant to Local Rule IB 3–2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

       Dated this 2nd day of August, 2019.

                               _____

                         **GEORGE FOLEY, JR.**
                         **UNITED STATES MAGISTRATE JUDGE**